Good morning. I'm Tom Borders. I represent Appellant North Central. May it please the Court. North Central rents and leases Caterpillar equipment. You may find that equipment used in sugar beet operations, mining, road work, or in one instance, in the case of the stipulated transactions, they were used in particularly the large trucks in a 24-hour-a-day, 7-day-a-week mining operation in South Dakota. This equipment wears out. It's used hard, and as a part of A person in the business of leasing has really two choices as to how to replace that equipment. One is they can sell it, take the proceeds, and buy a new piece of equipment. Another option, and that's perfectly permissible under the tax code, another option is to exchange that equipment. So you exchange a piece of equipment for another piece of equipment. Now the two ways of doing this are, in large effect, very similar. You get a new piece of equipment for an old piece of equipment. But the tax impact is substantially different. In the one instance, where you sell a piece of equipment, you have to pay tax. When you exchange a piece of equipment, you don't. And the difference between the two is really largely one of form, following the rules under Section 1031. Does it matter who you exchange the equipment with? It does, Your Honor. Yes, indeed, it does. How does that play into this case? Well, in this case, the government is contending that the exchange occurred with a related party. And the way they get there is they say you have to ignore the qualified intermediary. But in reality, I think if you look at our case, the way it was briefed, and you look at Taruja and Akmolji, there was no exchange with a related party because the intermediary was a cruet. And there's no doubt that in our case an exchange occurred. The real focus of the issue relates to some changes made in 1989, which says impose restrictions on exchanges with related parties. It just basically said if you exchange with a related party, you have to wait two years before you sell it. Otherwise, you're going to incur tax ramifications. In our case, the government is focusing on 1031F4, and that provision is essentially in there to prevent a workaround from 1031F1, which says here's what happens if you exchange with a related party. Help me out with the facts and describe kind of the process of equipment going from Caterpillar to Northcentral to the other entities involved here and ultimately just kind of walk us through that. Sure. Somebody's got to buy it from Caterpillar. Right. Northcentral used what was called the Deferred Exchange Program. And under that Deferred Exchange Program, the first thing that occurs is Northcentral gets rid of a piece of equipment that it no longer needs. And in order to conform to the rules, and there's no doubt about this part of the case, they use Accruit to collect the cash. Then the next thing that occurs... When you say they get rid of it, what happened to it? It's sold to a third party, completely unrelated to Northcentral. It's just sold to any third party that wants the piece of equipment that's used. The next thing that happens is... Where do those proceeds go for it? Go to... And they hold them based upon requirements set out in the IRS regulations in Subchapter K and Master Exchange Agreement, which they sign with in this case. And then they follow procedures in Ref Proc 2003-39 that basically provides a... Is that getting similar kind of equipment? Pardon me? Is that a section related to replacing the same kind of equipment? Similar kind of equipment. That section deals with... Sort of provides a recipe book or a guideline. How do you replace personal property? And it basically is designed to put barriers on the cash until the replacement property is received. So back to Judge Smith. After the sale, under the rules, Northcentral has 45 days to identify a piece of replacement property and then 180 days to actually get that property. What happened in the stipulated case is that at the time of the relinquished property was Butler didn't have any equipment coming in to Northcentral. The equipment that was coming in and they ultimately got was in a pipeline from Caterpillar or from two other dealers. It went into Butler. Approximately two weeks, 13 days later, it was transferred to Northcentral. After the transfer... So Northcentral gets the new equipment that flowed in from Caterpillar and in this case two other... Who paid Caterpillar? Butler paid Caterpillar. The equipment flowed through Butler. Butler was the conduit. And then after the equipment was received by Northcentral, Northcentral... Krewet, excuse me. Krewet paid Caterpillar. Or excuse me, they paid Butler. And then Butler paid Caterpillar and under the normal... Generally 180 days later, depends on a little bit of slippage, but certainly no longer than 180 days. Their terms were 180 days, yes. Isn't that a key fact here that they got use of the money for 180 days? I think it certainly was a key fact that the district court thought was important. I think when the district court focused on that, I think they misunderstood and misapplied the law. But certainly that's what occurred. And what the district court said is they looked at Coleman and they said, hmm, since they're getting access to this cash and it's unfettered, that's the word they used, and there's no restraint on Butler to immediately pay over Caterpillar, it's not earmarked, then that's the problem. I think they misread Coleman, misapplied Coleman, and take Coleman out of the context of a sale or exchange case. A sale or exchange case is you can't have access to the cash until after you've got the replacement property. And if you go back and look at an old Fourth Circuit case in 1944, North Shore Bus Company, sort of a little bit different than Coleman, but in that case, and we talk about it in our brief, replacement property is going to be new buses are going to be obtained, and the seller of the new buses provides cash to the owner of the old buses and says, you must, and they sign an agreement, you must use this cash to pay down the mortgage on the old buses before we do the exchange. And the court said, that's perfectly fine. That's an exchange. So Coleman and they look at this unfettered idea in the context of whether this is a sale or an exchange. In our case, the exchange already occurred. North Central's got the replacement property, and under the IRS regs and under the case story, there is nothing wrong with passing that money on to Butler. Butler had an offsetting liability to Caterpillar, and this is where the district court made the mistake. She said that's cashing out under Tarulla and Ogmulgee. Completely different set of circumstances. If you look at those two cases, Tarulla and Ogmulgee involved a situation where two related parties were both holding investment property, and in anticipation, we'll track the expectation of the statute. So in anticipation of selling the low basis property, they switched. So then the low basis property now has a high basis. And then they sell this new high basis property and hold cash. Aren't those two cases about basis shifting, and is that what happened here? No, they're really not about basis shifting. I mean, basis shifting is implicit in every single like-kind exchange. So if you do a like-kind exchange, you always have basis shifting. So is there basis shifting in those cases? Yes, but I don't think those cases are really about basis shifting. What those cases are about is basis shifting, which always happens, plus cashing out. And the cashing out in that instance was permanent. You know, you take two machines that are owned by related parties. Then all of a sudden, instead of two machines, you have one machine and cash. So that's completely different, we think, than in our instance where, first of all, Butler, and the Court confuses this three different times, I think it's pages 14, 15, and 16. They talk about Butler's investment, Butler's investment in like-kind property. Butler doesn't have an investment. What is Butler's role in this? Butler just served as a conduit. I mean, Butler was the parent corporation of North Central. The taxpayer, and the taxpayer here is North Central. The taxpayer is North Central. Butler is essentially neutral. I mean, Butler was paid by North Central an amount that Butler charged North Central, which was exactly the same amount that Caterpillar charged Butler. So Butler just acted as a conduit, or the money flowed through from a cruite to Butler and was paid to Caterpillar, or the property flowed through from Caterpillar to Butler and to North Central. Do you want to address the safe harbor regulation? Well, I think it does apply here, and it applies in this context. A lot of courts, if you look at Biggs' tax court case, Barker, or if you look at Starker, the Ninth Circuit case, what they say is that form is important, and particularly in like-kind exchanges, and when you follow the form, that sort of determines the substance. There's no dispute that we put in place a like-kind exchange program and that we followed the form. What they say is we tripped up because we used a qualified intermediary to break up a transaction that should have been between Butler and North Central. Well, that's just a fiction. I mean, we could have ordered the equipment directly from Cat, and, in fact, the record's clear that's what we're doing now. North Central didn't need Butler to get the benefit of the 180 days. They used Butler because that's the way they operated. It's a fairly lean organization. They operated in tandem. They operated in shared space. So, I mean, I think we do get the benefit of following the form, and I think the fact that we followed the form means that, in all other respects, the like-kind exchanges were respected. The key determination here is whether there was an intent to avoid the related party restrictions under F-4. Yes, Judge. Isn't that something? That seems to me it's a factual finding that we would review for clear error. Well, I think it's the way that the judge got there that creates the problem. First of all, she said that . . . Well, I understand that, but the question is, is that a factual finding that we review for clear error? I think not in this case. And give me a couple of seconds to get there. How about an intent not . . . Well, because she says, or the district court said, one, informant and substance were just like Tarulli and Okunology. Then the court concludes that the fact that Butler had access to cash, that Butler was cashing out, I think both of those are legal conclusions, and that Butler got the benefit of avoiding taxes. Well, I think that's a legal conclusion, too. And the fact is, Butler didn't get the benefit of avoiding any taxes because it couldn't even hold investment property under the like-kind exchange rules. So I think the opinion got that confused, too, because Butler can't engage in a like-kind exchange and receive any benefit. It can provide equipment or it can act as a conduit, but it can't benefit from a like-kind exchange and it can't defer taxes. I'm going to hold back and take the rest on. Thank you. Good morning. May it please the Court, my name is Jennifer Rubin, and I represent the United States in this case. And I'd actually like to start where Judge Smith started, which is what was this transaction, or really what were these sets of transactions about? And perhaps the easiest way to do this would be to look at page 15 of our brief where we have a chart. And essentially, the top part of the chart, the four parties at the top, that's North Central, accrue it, the purchaser, and Butler. That's a four-party exchange under the case law, that's the Coop case, as well as under the regulations that they refer to as the K regulations, we refer to as the deferred exchange regulations. And for these purposes, the Caterpillars is not relevant because it wasn't part of the exchange, and they have actually pretty much agreed with this in their description of it in the reply brief on page 5. So essentially, the parts of the exchange are what involved accrue it. Accrue it did a bunch of different transfers between these parties, and because accrue it held the cash pursuant to a master exchange agreement, where they were unable to use the cash for anything other than the acquisition of replacement property or otherwise for North Central's benefit, it falls within the deferred exchange regulations. And as Toria Brothers in the tax court makes clear, anytime you're talking 1031-F, you're probably talking about a situation where the exchange would otherwise be considered legitimate under 1031-A. So looking at this, what you essentially had is two situations, before and after all the transfers. So let's think about before the transfers occurred, before accrue it did everything it needed to do to affect this exchange, who had what? You had a purchaser, a purchaser who had money. You had North Central, who had low basis, used equipment, but really wanted to replace it. And you had Butler, who having inserted itself into this transaction, held two things. It held new replacement equipment, and it held a debt to Caterpillar, which we acknowledge was out there. Didn't have to be paid for 180 days, but it held that debt. So once accrue it does everything it needs to do to complete the transfers, to complete the exchange, who had what? Well, the purchaser no longer had cash. It had the used equipment. North Central sits there and he says, well, I've got the replacement equipment, and I never handled any cash. So I have a lifetime exchange, I get tax deferral. And Butler says, well, I've got the cash, but because I have to pay Caterpillar later, you shouldn't tax me on that. So we get the benefit of both the sales proceeds, because we get to use it for six months, unfettered access to that cash. And North Central gets the tax benefits, because that was a like-kind exchange under the regulations. That is what the court, and if you look at page 456 of the joint appendix, this is the district court's opinion. I mean, that's really the nub of this point, is what was the exchange? Who had what before? Who had what after? And this makes this exactly like Troy Brothers' Nagamogi Field. They were using a qualified intermediary, and after the exchange was done, the related party held cash. They held the sales proceeds, and they could use it for whatever they wanted. They were not a true conduit. You know, this was used throughout their briefs. This was used throughout the opening argument. They tried, actually, oddly enough, to compare themselves on reply brief page six to a cruet and said, oh, we're a conduit like them, like a cruet. They were not a conduit like a cruet. But if you look at a cruet's master exchange agreement, and this is going to be JA 52 to 54, they were completely limited in how they could use the cash proceeds from the sale of the used equipment. They had to put it in a special account for North Central's benefit. They had to use it for replacement property, or if there was no replacement property ever identified, if no exchange occurred, or if there was extra money booed, to give it to North Central. But they couldn't put it into an accrued account. They couldn't use it for accrued general business purposes. They couldn't pay down accrued payroll, accrue its line of credits, accrue its utilities. Oh, but Butler could. Butler put it into their general account, as Vlotsky made it very clear in her testimony. If Butler had segregated this money, put it into an escrow account, or somehow segregated it, is it then okay? Certainly if they were required to do so. I mean, that's what the case law makes very clear. In any other like-kind exchange situation, if there's true substantial limitations put on. Now, if Butler just voluntarily put it into an escrow account, I don't know that that would necessarily be enough. But let's hypothesize instead that there was some sort of a requirement. Caterpillar said, I require the money from the sale of that used equipment to be used to pay for this replacement equipment, which is essentially what happened, as I understand it, in some of these other cases that they're relying upon. You know, like Commissioner versus North Shore, where there were cases where there was an actual requirement, a contractual requirement that the money be used for the specified purpose. You know, the thing that the like-kind exchange rules, whether that's a regular like-kind exchange, it's not deferred, no related party. A deferred exchange or a related party exchange, all of these rules are designed to try to ensure that the taxpayer or the taxpayer's economic unit, if you're considering the related parties together, do not get the benefits of a sale, as well as the benefits of a like-kind exchange. The benefits of the sale are unfettered access to sales proceeds. The benefits of a like-kind exchange are tax deferral. And the only way, the only way, and this is something that was found by the district court. There's no answer to it. There's no showing of clear error. The only way that North Central could get the benefits of both the sale and tax deferral was by inserting Butler into these transactions. You know, they mentioned that- Accrue it. Let's say that, in other words, couldn't accrue it the, had the benefit of the six months to pay, which they would have presumably put in an interest-bearing account, which would have then benefited North Central. Wouldn't that work? Well, there again, you know, then the taxpayer wouldn't have unfettered access to it. It would be sitting in an account, and then they would pay taxes on the interest. The whole key is the unfettered access. The unfettered access. And, you know, there's a few different rules, and this is developed in the case law. It's developed in the regulations. But if you get the sales proceeds before you get the replacement property, it's probably going to be treated as a sale. But you're going to have to pay taxes on that. If you get money at the same time or after you get the replacement property, it's going to be treated as boot. And these rules, and these are developed throughout the case law. But if you get unfettered access to cash or other non-like-kind property in any other context in the like-kind world, you have to pay taxes. You have to pay taxes on your gains up to the amount of the proceeds you got. Now, there's been a lot of confusion in the briefs about what all these different cases say and what all they mean. So thinking about that, I tried to look at this and say, what are all these cases doing? And, you know, there's the Coop case and the Starker case, which are focused on in the reply brief. In these, the court specifically found the taxpayer never even had access to the cash. I believe in each case it was put into an escrow or else were held by somebody who was a separate party. In the Barker case, the North Shore case, Garcia, it was considered to be a like-kind exchange, even though the cash was held by the taxpayer. Why? Because there were substantial limits on their ability to use it. They definitely focused on that and said that makes this different from the Coleman case. The Coleman case, as well as Biggs, are examples of where there was a like-kind exchange, but money was treated as boot. And I'm going to get back to Coleman in just a moment. And then you have the situations where a party got a like-kind, was found not to have had a like-kind exchange because they got unfettered access to the cash, and that's Carlton and Swain. Now, what they're trying to say here is that somehow in this related party context, they have this special ability for a butler to get a hold of this money and have unfettered access to it. It makes no sense. Is it any requirement that that money be used for something other than purchasing equipment in order to not qualify for like-kind? I mean, I think. Is there anything here that indicated they used it for anything other than purchasing? Absolutely. There's trial Blodsky's testimony, that's JA 218-19. They put in their general account, used it for anything they wanted. You have to remember. Did they in fact use it for assorted items? They used it for payroll. They used it for utilities. I also think if you were to look at her deposition, which was also cited by the district court, although it's not in the joint appendix, this is document 76-16 at page 54. It also indicates it was used to pay down other lines of credit. The thing to also remember is they did about 100 of these a year. I think it was 398 over this four-year period. And this means you're getting these overlapping periods, so they're constantly having this flow of cash. That was predictable because of the long-range ordering that was being done. The same amount of cash ended up in the account at the time of the replacement, didn't it? I'm not sure I understand the question. I mean, I think what happened was when they had replacement equipment worth X and they got the sales proceeds from the unrelated purchaser via accruant, that went into their account and could be used for anything. So it was definitely an exchange of value, the replacement property for the cash. And looking at the question as to whether North Central could have gotten access to this cash, the answer is no. And there's several different pieces of evidence that goes to that as well as a legal reason. The first thing is, you know, Abram from Accruit actually said, look, we would have paid Caterpillar. We would have paid the ultimate supplier. We paid Butler because it was the supplier in this structure. But if Butler hadn't been it, we would have paid the supplier. That's JA300201. And as a technical matter, it would have been Accruit doing the ordering under North Central's number. That's Exhibit D512, I believe. And under that, it basically says, you know, actually the one who would have gotten the benefit of the DRS terms is Accruit. North Central wouldn't have been sent the cash. And that's what's going on right now. As my opponent mentioned during his opening argument, currently, as of I believe it was 2009, Butler dropped out of the transactions. The money goes to Caterpillar. It doesn't go to North Central. But in all events, that has to be how it works because otherwise the safe harbor that's found in the deferred exchange regulations goes away. It ceases to exist if you either get access to the cash or if you have a right to access the cash. And this is something that's never addressed anywhere in the briefs by North Central, but it's still there in the regulations. And that is, I believe it's Treasury Regulation 1.1301-1G46. And ultimately, this as well as the entirety, again, a truncated version as discussed by my opponents in their briefs, of Section F1 of that same regulation just makes clear if you get access to the sales proceeds, you are taxed. And what we're saying in this case is, and what 1031-F4 is saying, is you can't use a related party structure to get around this problem. Now, looking again to this chart on page 15, another reason, and a big reason why we included this chart in the brief is because I think it displays exactly how unnecessary Butler is. When they say, oh, the property just went through us and the cash went through us, and of course we got to hold the cash for six months and use it for whatever we wanted. The fact is, if you drop Butler out, if you were to cover Butler up, like with a business card or something, you know what, that transaction works just as well. But neither of the related parties gets the sales proceeds then. Neither gets the benefit of these DRIS terms. And that really is the economic nub here. Well, okay, North Central would get the benefit of the DRS terms, at least to the extent that accruity would put it in an interest-bearing account. They just wouldn't have unfettered access, right? They would not get unfettered access to it. That's what we mean by the benefit of the sales getting the unfettered access to it. But in all events, they have to pay taxes on that interest. And essentially what's really going- Minimum is probably. No, it's a lot of money. You know, I think there were millions upon millions of dollars of these transactions being done each year. I mean, I think their average tax deferred, so that's taxes on their gains only, not the entirety of the transaction, was $20 million a year. So, you know- Not tax on the interest that would be earned. Right, but interest over, I believe that if you look in the exchange agreement, there was a whole set of things that accruant had to do in order to invest, like in money markets, whatever. But it adds up. But in all events, if it's de minimis, then that says that really isn't much of a benefit anyway. So if they got any real benefit, they were taxed on it. If accruant was holding it for six months. If there was no real benefit, then there's no real benefit. But the fact is, what the law is really looking at, and this is true in every context, this is true under a regular like-kind exchange, under the deferred exchange regulations, and under the related parties. It's got to be the same under the related party. Just as Troy Brothers-Knock-Mulkey-Fields makes clear, you're not supposed to get the benefit of the tax deferral the same time you get the unfettered access to the sales proceeds. And if you do, you're taxed. And that's what's happened here. Are there any questions that I can answer about anything else? For the reasons stated in our brief, we urge this Court to affirm the district court order. Thank you. Thank you, Your Honors. I think the counsel, if you look at the transaction on page 15. Can I ask sort of a fundamental question? Sure. She throws out the proposition that unfettered access to cash means you're going to get taxed in a like-kind exchange situation or what's trying to be a like-kind exchange situation. As a general proposition, is that right? I think that might be the case, yes. I mean, any time you receive something, it's taxable income unless there's an exclusion. Here we have a related party, Butler, getting unfettered access to cash. I think that's her argument. What's wrong with that argument? Well, first of all, Butler had an offsetting deduction exactly equal to the amount that was being paid to it by a cruite. So if Butler paid $100 to Cat, it would get $100 from a cruite. They're even, completely even. So in a sense, your tax return might show income than an offsetting deduction. For six months, they had unfettered access to the cash, which means it looks more like a less like a like-kind exchange. I don't think so, Your Honor, because the like-kind exchange has already occurred, and that's the point of looking at the regulations that we talk about in our brief. And if you look at the case authority, the only time unfettered access to cash creates a problem is if you get that cash and you're not obligated to use it to buy replacement property. And the regs say before you acquire replacement property. In this case, the replacement property is already at North Central. So I think that that's really a red herring. Coleman is a red herring. Yes, we had the cash, but, I mean, it's no different than a loan. For example, you can have a loan from anybody at no interest for six months under the tax code, and that doesn't create a problem. So I do think that's a mischaracterization of the cases and the law and the regs. The second thing is they talk about the transaction. And the question is, and she said before the transfer. I think the reality is that the like-kind exchange, Butler didn't have any equipment. The like-kind exchange began when North Central sold. But at that moment, Butler didn't have any equipment in inventory. Is there a necessary delay in getting the new equipment? The new equipment is ordered by North Central, and it's on long-term. You know, sometimes it takes two years to make a piece of equipment. But there's a pipeline of equipment that generally North Central can anticipate being delivered, because it places a number of orders for property that it intends to replace. And that's a factor that requires this time interval. It just takes a long time to get it, so you have to commit. For example, if you commit to one of these big 777 trucks, you make the commitment two years in advance, and that truck and Caterpillar lets North Central know where that truck is in production and when they might expect delivery. Well, that's a very interesting area of the law that we'll explore further. Thank you both for your arguments, and that is the end of our argument calendar this morning.